FILED

2010 Sep-30  PM 03:50
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| **JAMES AUSTIN,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| **v.** | ) | Civil Action Number |
| | ) | **2:09-cv-01647-AKK** |
| **BLUE CROSS AND BLUE** | ) | |
| **SHIELD OF ALABAMA,** | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

The court has before it Defendant Blue Cross and Blue Shield of Alabama's

("Defendant") Motion to Strike, (doc. 32), and Motion for Summary Judgment,

(doc. 33).  Plaintiff James Austin ("Plaintiff") responded, (doc. 41), and Defendant

replied, (docs. 46 & 47).  Defendant's motions are now ripe for resolution by this

court.  For the reasons set forth below, Defendant's motions are GRANTED.

## I.    FACTUAL BACKGROUND

Plaintiff filed this action on August 18, 2009, (doc. 1), and amended his

complaint on October 21, 2009, (doc. 15).  Plaintiff's two-count amended

complaint alleges violations of the Americans with Disabilities Act ("ADA"), 42

U.S.C. § 12182(a), and the Rehabilitation Act, 29 U.S.C. § 794.

*A.*     ***The Parties and the Preferred Medical Doctor Program***

Defendant is a health insurance company with its corporate headquarters in Birmingham, Alabama.  Doc. 35-10 ¶ 2.  The Preferred Medical Doctor Program ("PMD Program") is a contractual relationship between Defendant and physicians admitted into the PMD Program.  *Id.* ¶ 5; Doc. 35-11 at 3 ¶ 3.  The PMD Program is housed and administered in Defendant's corporate headquarters.  Doc. 35-10 ¶ 5;  Doc. 35-11 at 3 ¶ 3.  Licensed physicians may seek admission to the PMD Program by submitting a Letter of Interest to Defendant.  Doc. 35-10 ¶ 5; Doc. 35-11 at 3 ¶ 3.  Defendant's Credentialing Committee reviews the application and decides whether to approve or deny the applicant.  Doc. 35-10 ¶ 5; Doc. 35-11 at 3 ¶ 3.

Plaintiff is an osteopathic physician who owns and operates Rapid Care, Inc. ("Rapid Care"), two walk-in medical clinics located in Albertville and Fort Payne, Alabama.  Doc.  35-1 at 8, 11-12 (Dep. pp. 27, 37, 43).  Defendant first admitted Plaintiff to the PMD Program in or around March 25, 1992.  Doc. 35-11 at 3 ¶ 4.

*B.*     ***Alabama Board of Medical Examiners' Investigation***

After forming Rapid Care in 1996, Plaintiff issued Standing Orders dated June 10, 1997, related to treating patients at his clinic.  Doc. 35-1 at 12, 17 (Dep.

2

p. 43, 64); Doc. 35-2 at 30.  The Standing Orders listed several areas of examination and tests for Rapid Care to run on all patients, including lab chemistries and x-rays.  Doc. 35-1 at 17-18 (Dep. pp. 64-65); Doc. 35-2 at 30.

On August 20, 1997, the Alabama Board of Medical Examiners ("ABME") received a letter from one of Plaintiff's patients ("Mr. H.") complaining of unnecessary tests and a misdiagnosis.  Doc. 35-12 at 5-6.  The ABME sent Mr. H. a letter dated August 22, 1997, informing him that it would investigate the complaint.  Doc. 35-12 at 4.  On November 19, 1997, and March 16, 1998, the ABME Credentials Committee recommended continuing their investigation of Plaintiff and sending Plaintiff's records for expert review.  *Id.* at 14-15.  In a letter dated April 2, 1998, an expert reviewed Mr. H.'s chart and concluded that Plaintiff's tests and therapy were "excessive," "unbelievably expensive," "nonsensical," and "inappropriate."  *Id.* at 16-17.  A second expert conducted a review of at least fifteen patient records, and, in a letter dated April 6, 1998, opined that Plaintiff's practice was "clearly below standard and his charges clearly excessive."  *Id.* at 18-36.  The expert added: "I feel that this physician is basically dishonest and has provided poor care which could easily be detrimental to his patients . . . ."  *Id.* at 18.

On May 20, 1998, the ABME Credentials Committee recommended filing

3

an Administrative Complaint against Plaintiff with the Medical Licensure

Commission of Alabama ("MLCA") for "unprofessional conduct, endangering the

health of patients, and the performance of unnecessary tests and services." *Id.* at

37.  The ABME adopted the motion, and issued an Administrative Complaint

against Plaintiff on September 10, 1998. *Id.* at 37-43.  On February 3, 1999,

Plaintiff appeared on a list of physicians issued by the ABME  "who reported

mental or physical conditions during 1998 which may have affected their ability to

practice medicine." Doc. 42-4.  The MLCA suspended Plaintiff's medical license

on March 2, 1999.  Doc. 35-13 at 1-4.  The suspension order contained several

terms and conditions, including making "restitution for all over-charges in

conjunction with an audit to be made by Blue Cross Blue Shield of Alabama" and

remaining active for two years in a treatment program for chemical dependency.

*Id.* at 3.

The MLCA reinstated Plaintiff's license but placed him on indefinite

probation on August 30, 1999.  *Id.* at 5-6.  On May 30, 2002, the MLCA lifted the

indefinite probation and restored Plaintiff's unrestricted license.  *Id.* at 37-38.

**C.    *Defendant's Investigation and Termination***

On October 16, 1997, a doctor who worked with Plaintiff complained to

Defendant that every patient who visited Rapid Care received a tympanogram, a

4

CBC (blood test), and an injection.  Doc. 35-11 at 10.  This doctor further reported that Plaintiff "tried to get him to do some of these things in order to get paid more."[1]  *Id.* at 10, 12.  In response, an internal office email between two of Defendant's employees stated "it seems to me that we ought to take a look at this guy." *Id.* at 10.

According to a subsequent Quality Review Summary Report generated by Defendant from a review performed in Plaintiff's office on December 11, 1997, Plaintiff was one of the top twenty-five billers for 1997 and made 250% above the next top biller in his specialty.  *Id.* at 12, 20-22.  William Hansford ("Hansford"), Defendant's Associate Medical Director, audited Plaintiff's records and identified a number of problematic billing practices, which he set forth in an email dated January 27, 1998: (1) documentation did not always support treatment and services provided; (2) other physicians in Plaintiff's clinic were using his provider number; (3) overutilization of some services, such as injections, x-rays, and lab tests; and (4) untrained personnel evaluated patients and ordered tests.  Doc. 35-11 at 4 ¶ 7; Doc. 35-11 at 14.

Hansford sent Plaintiff a letter dated February 12, 1998, which set forth the

---

[1]Plaintiff admits that Defendant correctly portrays the contents of that internal email.  He does not, however, admit the truth of the statements.  Nevertheless, he offers no evidence to rebut the accuracy of Defendant's evidence.  *See* Doc. 41 at 7 ¶ 21.

5

audit findings and further noted that "[w]e consider [those practices] to be abuses of the PMD program." *Id.* at 18.  Hansford further stated that "[i]f this pattern continues, termination of your PMD participation may be necessary." *Id.* Defendant sent a second letter, dated February 23, 1998, detailing the results of its quality review on December 11, 1997, and requesting that Plaintiff reimburse it $15,684.15 for the issues identified in that audit.  *Id.* at 20-22.  Plaintiff reimbursed Defendant on March 8, 1998.  Doc. 35-3 at 65.

Defendant conducted a follow-up quality assessment in Plaintiff's office on April 27, 1998.  Doc. 35-11 at 24.  In a letter to Plaintiff dated July 1, 1998, Defendant detailed the findings of that assessment and requested a reimbursement of $3,921.41 for overpayments, which Plaintiff paid.  *Id.* at 24-25; Doc. 35-3 at 66.

In a letter dated July 31, 1998, Defendant's Vice President of Provider Affairs informed Plaintiff that Defendant was terminating its PMD Agreement with Plaintiff.  Doc. 35-11 at 27.  The letter stated: "Based on results of our previous PMD quality assessments, we have determined that you have continued a pattern of excessive and inappropriate services despite being notified of such practices . . . ." *Id*.  Defendant terminated Plaintiff from the PMD Program approximately nine months before the MLCA suspended his license and eight months before the AMBE included Plaintiff in a list of physicians with "mental or

6

physical conditions . . . which may have affected their ability to practice medicine."  Doc. 35-13 at 1-4; Doc. 42-4.

### D.     *Plaintiff's History of Drug Abuse and Treatment*

In August 1998, after Defendant terminated him from the PMD Program, Plaintiff entered the Ridgeview facility in Atlanta for chemical dependency.  Doc. 35-1 at 25-26 (Dep. pp. 96, 100).  He moved to a treatment facility at the University of Alabama at Birmingham in September 1998.  *Id.* at 26 (Dep. p. 100). Plaintiff testified in his deposition that, prior to his treatment, he abused narcotics that he obtained from samples, his clinic's pharmacy, and prescriptions he wrote for family members.  *Id.* at 26 (Dep. p. 98).  According to Plaintiff, "[t]he drugs affected [his] judgment in a great way."  *Id.* at 35 (Dep. p. 135).

### E.     *Plaintiff's Attempts to Be Readmitted to the PMD Program*

Plaintiff applied for reinstatement to the PMD Program in 2003, 2004, 2005, 2006, and 2007; Defendant denied his request each year.  *Id.* at 33 (Dep. p. 127). On March 29, 2005, Plaintiff's attorney, Tim Croyle ("Croyle"), wrote Defendant regarding the 2005 denial.  Doc. 42-7.  Defendant responded that the "Credentialing Committee denied Dr. Austin's PMD status on March 17, 2005 due to concerns of past history."  *Id*.  The record indicates that Plaintiff made no inquiries regarding the denial of his 2006 and 2007 applications for reinstatement.

Plaintiff applied again in 2008.  Doc. 35-1 at 33 (Dep. p. 128).  Defendant's

Credentialing Committee discussed Plaintiff's application on July 17, 2008.  Doc.

35-11 at 33-35.  The Credentialing Committee Serious Review Summary Page

states: "Provider was previously audited, terminated, and subsequently denied

01/21/03, 04/16/04, 03/17/05, 05/18/06, and 04/19/07 due to history of

overutilization, unnecessary testing and unnecessary treatments potentially

causing harm to patients."  *Id.* at 35.  The Committee voted unanimously to deny

the application.  *Id.* at 33-35.  Defendant sent Plaintiff a letter dated July 22, 2008,

simply stating that "it has been determined that we will be unable to enroll you in

the program at this time."  Doc. 35-7 at 33.

> In a letter to Defendant dated August 15, 2008, Croyle wrote:

> I understand Dr. Austin's illness/disability may have given the PMD
> program pause when it occurred ten (10) years ago.  However, since
> that time, Dr. Austin has had no further relapses, and his medical
> license has been free of any question, concern or imperfection for
> most of a decade.

> As his attorney, I would request that you give me some reason for the
> continued denial of participation in the PMD program.  If there is an
> appeal vehicle, we wish to avail its use.

Doc. 43-4.  Barry Evans ("Evans"), the Credentialing Manager for the PMD

Program from 2001 to 2009, testified that he thought he received this letter but

that he would have turned it over to Network Services, which is responsible for

meeting with doctors.  Doc. 42-2 at 19-20 (Dep. pp. 72-73).  He did not know if

Network Services responded to the letter.  *Id.* at 20 (Dep. p. 73).  In a letter dated

September 22, 2008, Croyle wrote:

> Enclosed is a copy of the last letter I wrote to you, which is but one in
> a long series of denials from you, forbidding James Randall Austin,
> D.O.'s participation in the PMD program.
>
> Please allow Dr. Austin and I to appeal the decision to someone other
> than the person or committee who has denied Dr. Austin's continued
> requests.  Dr. Austin's disability no longer affects him, and has not
> since 1998 or 1999.  He has had no malpractice claims or disciplinary
> action this century.

Doc. 44-1.

Evans further testified that the Credentialing Committee would have known

about Plaintiff's substance abuse issues because there is a question pertaining to

that issue on the PMD application.  Doc. 42-2 at 11-12 (Dep. pp. 39-41).

**F.     *Other Physicians Terminated for Overutlization***

From 2001 to 2009, Defendant has terminated twenty-eight providers from

the PMD Program for overutilization.  *Id.* at 10 (Dep. pp. 33-34).  Of those,

Defendant has reinstated only one provider.  *Id*.  Evans testified that Defendant

reinstated that physician because he was part of a practice with overutilization

issues and Defendant believed that the individual "didn't have knowledge of the

issues that were going on behind his back."  *Id*.

9

## II.    SUMMARY JUDGMENT STANDARD

Under Rule 56(c)(2) of the Federal Rules of Civil Procedure, summary

judgment is proper "if the pleadings, the discovery and disclosure materials on

file, and any affidavits show that there is no genuine issue as to any material fact

and that the movant is entitled to judgment as a matter of law."  "Rule 56(c)

mandates the entry of summary judgment, after adequate time for discovery and

upon motion, against a party who fails to make a showing sufficient to establish

the existence of an element essential to that party's case, and on which that party

will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

(1986).  The moving party bears the initial burden of proving the absence of a

genuine issue of material fact.  *Id*. at 323.  The burden then shifts to the

nonmoving party, who is required to "go beyond the pleadings" to establish that

there is a "genuine issue for trial."  *Id*. at 324 (citation and internal quotation

marks omitted).  A dispute about a material fact is genuine "if the evidence is such

that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The court must construe the

evidence and all reasonable inferences arising from it in the light most favorable to

the non-moving party.  *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970);

*see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the

10

non-moving party's favor).  However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989)).  Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252)).

## III.  ANALYSIS

Plaintiff asserts claims pursuant to Title III of the ADA and Section 504 of the Rehabilitation Act.  Defendant contends that Plaintiff's claims fail because he cannot establish that Defendant denied him readmission to the PMD Program on the basis of his disability.  Defendant argues that Plaintiff's claims fail also because the PMD Program is not subject to the ADA or the Rehabilitation Act. For the reasons stated below, the court finds that Plaintiff failed to meet his burden of establishing that his alleged disability factored into Defendant's decision to deny him readmission to the PMD Program.

### A.  *Standard under Title III of the ADA*

Title III provides: "No individual shall be discriminated against on the basis

of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation."  42 U.S.C. § 12182(a).  The ADA defines disability as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment . . . ."  42 U.S.C. § 12102(1).  Plaintiff contends that his former drug addiction meets the definition of "a record of" a physical or mental impairment under the ADA.  Doc. 41 at 15 (citing *Ambrosino v. Metro. Life Ins. Co.*, 899 F. Supp. 438, 442 (N.D. Cal. 1995)).  Defendant does not contest Plaintiff's contention that he is disabled or that he has "a record of" impairment.  Therefore, for this analysis, the court assumes that Plaintiff has a "disability" under the ADA.

To prevail under Title III, Plaintiff must prove: "(1) that [h]e is an individual with a disability; (2) that defendant is a place of public accommodation; and (3) that defendant denied her full and equal enjoyment of the goods, services, facilities or privileges offered by defendant (4) on the basis of her disability." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1289, 1299 (11th Cir. 2005) (citation omitted); *accord Camarillo v. Carrols Corp.*, 518 F.3d 153, 156 (2d Cir.

2008); *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 730 (9th Cir. 2007). "As with Title I employment cases, the plaintiff in a Title III case must establish that her disability was the reason for denial of service." Henry H. Perritt, Jr., *Americans With Disabilities Act Handbook* § 6.07 (2003). When, as here, a plaintiff seeks to prove his discrimination case through indirect or circumstantial evidence, the court applies the *McDonnell Douglas* burden-shifting analysis.[2] *Rothman v. Emory Univ.*, 123 F.3d 446, 451 (7th Cir. 1997) (citing *McDonnell Douglas v. Green*, 411 U.S. 792 (1973)). Under that analysis, if the plaintiff demonstrates a *prima facie* case of discrimination, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for any alleged adverse action. *Id.* "If the defendant meets this burden, the plaintiff then has the opportunity to show that the defendant's articulated reason was merely a pretext for its discriminatory action." *Id.*

## B.    *Standard under the Rehabilitation Act*

Section 504 of the Rehabilitation Act provides: "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be

---

[2]The court notes that not all Title III cases employ the burden-shifting framework. In *Rothman*, the Seventh Circuit applied the burden-shifting framework in a case brought by a former law student against his law school. 123 F.3d 446. Here, the court similarly finds that the *McDonnell Douglas* causation analysis is helpful in addressing Plaintiff's claim, which bears similarities to discrimination claims within the employment context.

excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a).  The Act defines "disability" as "a physical or mental impairment that constitutes or results in a substantial impediment to employment." 29 U.S.C. § 705(9).  Plaintiff contends that individuals who seek treatment for their drug addition meet the Act's definition of disability.  Doc. 41 at 16-17 (citing *Burka v. N.Y. City Transit Auth.*, 680 F. Supp. 590 (S.D.N.Y. 1988)).  Defendant does not contest Plaintiff's contention that he is disabled.  Therefore, for this analysis, the court assumes that Plaintiff has a "disability" under the Rehabilitation Act.

Plaintiff must prove the following elements to prevail under Section 504: (1) that he is disabled; (2) that he is otherwise qualified for participation in the program; (3) that he is being excluded from participation in, being denied the benefits of, or being subjected to discrimination under the program solely by reason of his disability; and (4) the program receives federal financial assistance. *Doherty v. S. Coll. of Optometry*, 862 F.2d 570, 573 (6th Cir. 1988) (citations omitted); *accord Shepherd v. U.S. Olympic Comm.*, 464 F. Supp. 2d 1072, 1089-90 (D. Colo. 2006) (citation omitted).  Although the ADA and the Rehabilitation Act are similar, the Rehabilitation Act's "solely by reason of" standard is more

14

restrictive than the "but for" standard required by the ADA.  *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1212 n.6 (11th Cir. 2008).

### C.    *Plaintiff Fails to Establish that Defendant's Reason Is Pretextual*

This case boils down to whether Plaintiff can establish that his disability factored into Defendant's decision to deny his application for reinstatement of his PMD status.  To no surprise, the parties disagree as to whether Plaintiff establishes his burden of proving pretext under the third prong of the *McDonnell Douglas* analysis.  Defendant argues that Plaintiff fails to meet his burden because he presents insufficient evidence to establish Defendant's articulated reason for not readmitting Plaintiff – his history of overutilization – is pretext for discrimination.[3] Doc. 34 at 22-23.  As a consequence, Defendant argues that Plaintiff cannot establish that Defendant's refusal to readmit him to the PMD Program is "on the basis of" or "solely by reason of" his disability.  *Id.* at 24.  In response, Plaintiff argues that he presents sufficient evidence to create a material issue of disputed fact on pretext.  To do so, he argues that: (1) his overutilization and substance abuse are inextricably intertwined; (2) evidence suggests that Defendant denied

---

[3]Defendant also argues that its reasons for terminating Plaintiff from the PMD Program in 1998 were legitimate and non-discriminatory.  Doc. 34 at 17-22.  As Plaintiff does not dispute the termination decision, (doc. 41 at 17), the court confines its analysis to the readmission dispute.

his applications on the basis of his "past history" of substance abuse;

(3) Defendant has reinstated another doctor terminated for overutilization. Doc.

41 at 17-26. Each of Plaintiff's arguments fails for the reasons discussed below.

### 1.    *Plaintiff's Overutilization and Substance Abuse are Inextricably Intertwined*

Plaintiff's primary argument is simple: the overutilization occurred at the

same time as his substance abuse, and the former "was a causally connected

manifestation" of the latter. *Id.* at 24. Plaintiff states that his "status and conduct

directly resulting from his disability is considered to be part of the disability, not a

separate basis for termination." *Id*. Thus, he contends that Defendant's decision

to deny him readmission to the PMD Program because of his admitted prior

overutilization[4] is in effect discrimination against him because of his alleged

disability. To support his contention, Plaintiff points to a number of facts linking

his overutilization to his chemical dependency: (1) he began treatment for

addiction in September 1998, shortly after Defendant terminated him from the

PMD Program and during the ABME's investigation, (doc. 35-1 at 25-26 (Dep.

pp. 95-96, 100)); (2) on February 3, 1999, his name appeared on the ABME

---

[4]Plaintiff states in his response: "Plaintiff is not asserting that [Defendant] did not have a legitimate, nondiscriminatory reason for terminating [Plaintiff]'s PMD status in 1998, when he was *currently* using drugs and overutilizing." Doc. 41 at 17 (emphasis in original).

Memorandum listing physicians with medical conditions affecting their ability to practice, (doc. 42-4); and (3) the March 2, 1999, suspension order from the ABME required Plaintiff to undertake a number of rehabilitative acts, including making restitution to Defendant for over-charges, (doc. 35-13 at 3).  Unfortunately for Plaintiff, the law does not excuse his misconduct simply because it was purportedly caused by an alleged disability.

"Although the ADA might protect a plaintiff from adverse employment action taken because of his alcoholism or drug addiction, it provides no bar to discipline for employee misconduct."  *Pernice v. City of Chicago*, 237 F.3d 783, 785 (7th Cir. 2001) (citations omitted).  In *Pernice*, the plaintiff, a police officer terminated for possession of drugs, argued that his misconduct – possession of drugs – could not be separated from his disability – drug addiction.  *Id.* at 786.  Rejecting his argument, the Seventh Circuit stated:

> In short, Pernice is not like a driver who without warning experiences an epileptic seizure which causes him to veer onto the sidewalk and strike a pedestrian.  Whether or not his alleged disability of drug addiction created a wholly involuntary *need* to possess drugs, Pernice made a conscious choice to *actually* possess drugs.  We therefore have little trouble separating his misconduct from his alleged disability.  The City may punish Pernice for the former without violating any legal protections he may possess because of the latter.

*Id.* at 787 (emphasis in original).  *See also Collings v. Longview Fibre Co.*, 63

F.3d 828, 832-34 (9th Cir. 1995) (affirming that "alcoholics and drug addicts are not exempt from reasonable rules of conduct;" concluding that the defendant did not violate the ADA when it terminated employees on the belief that they possessed drugs at work); *Daft v. Sierra Pac. Power Co.*, 251 Fed App'x 480, 482-83 (9th Cir. 2007) (finding no violation of the ADA when employer terminated employee for misconduct, failing an alcohol test during work hours); *cf. Nielsen v. Moroni Feed Co.*, 162 F.3d 604, 608 (10th Cir. 1998) ("One area . . . where the ADA and the Rehabilitation Act recognize a dichotomy between a disability and disability-caused misconduct is where the disability is related to alcoholism or illegal drug use."). In short, courts have soundly rejected attempts to conflate the disability of drug addiction with misconduct occasioned by that addiction.[5]  This court does so as well and rejects Plaintiff's attempt to prove

---

[5]Plaintiff urges the court to follow *Ambrosino*, in which an insurance company terminated a physician's participating physician agreement after learning that the Board of Podiatric Medicine had placed him on probation for misusing Demerol.  899 F. Supp. at 440.  The insurance company's policy was to terminate any doctor with a prior chemical dependency problem even if the doctor had been successfully treated and the substance abuse had never resulted in harm to a patient.  *Id*. at 440-41.  The court found that the termination violated California's anti-discrimination statute, which was modeled on the ADA.  *Id.* at 444-45.  *Ambrosino*, however, is factually distinguishable.  In that case, the plaintiff's status as a former abuser of Demerol was the insurance company's sole reason for terminating his preferred provider status.  Here, Defendant terminated Plaintiff and has refused to readmit him based on his well-documented history of overutilization.  While Plaintiff may argue that the conduct was *related* to the disability, his overutilization is conceptually distinct from his chemical dependency issues.  Additionally, *Ambrosino* relies on the Second Circuit's decision in *Teahan v. Metro-North Commuter Railroad*, which found an ADA violation when an employer terminated an employee for excessive absenteeism related to his previous alcoholism.  951 F.2d 511 (2d Cir.

pretext on Defendant's articulated reason – past history of over-billing – by attempting to tie it to his prior substance abuse history.

Taking the evidence in the light most favorable to Plaintiff, the court assumes that his chemical dependency problems greatly affected his judgment, and contributed or caused the overutilization problems leading to his 1998 termination. Nevertheless, under the line of cases cited above, the ADA does not protect Plaintiff from the consequences of his misconduct. While Defendant may violate the ADA if it refused to readmit Plaintiff because it perceives him to be a recovered substance abuser, it does not violate the ADA by holding Plaintiff accountable for misconduct allegedly caused by his substance abuse.

## 2. *Defendant's Refusal to Readmit Plaintiff is Based on His Previous Chemical Dependency*

Plaintiff's second argument is that he in fact presents sufficient evidence to create a genuine issue of material fact on whether Defendant's reason for not

---

1991). Not only does *Teahan* represent an approach to substance abuse-related misconduct followed by only a minority of circuits, the Supreme Court cast doubt on the viability of that approach in *Raytheon Co. v. Hernandez*, 540 U.S. 44 (2003). In *Raytheon*, the Supreme Court granted certiorari to determine whether "the ADA confers preferential rehire rights on disabled employees lawfully terminated for violating workplace conduct rules." *Id*. at 46. Although the court did not reach that question, it did determine that "a neutral no-rehire policy is, by definition, a legitimate, nondiscriminatory reason under the ADA." *Id*. at 51-52. Thus, to prevail, a plaintiff would have to prove that the stated no-rehire rule was actually a pretext for discrimination. *Id*. at 52. Although not a definitive answer to the question before the court, *Raytheon* strongly suggests that the Supreme Court, like the majority of Courts of Appeals, would decouple misconduct from a drug-related disability.

readmitting him is his past history of chemical dependency.  Plaintiff's primary evidence is the May 4, 2005, letter from Defendant to Plaintiff's attorney stating that the "Credentialing Committee denied Dr. Austin's PMD status on March 17, 2005 due to concerns of *past history*."  Doc. 42-7 (emphasis added).  Plaintiff also points to the fact that Defendant did not provide a reason in its form letters denying the readmission after each application.  Doc. 35-1 at 33 (Dep. p. 127); Doc. 43-1; Doc. 43-2; Doc. 43-3.  Finally, Plaintiff notes that Defendant did not respond[6] to Croyle's letters dated August 15, 2008, and September 22, 2008, which stated that Plaintiff's disability no longer affected him and requested an appeal of his most recent denial.  Doc. 43-4; Doc. 44-1.

"A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party."  *Walker*, 911 F.2d at 1577 (citing *Anderson*, 477 U.S. at 252); *see also Young v. City of Palm Bay, Fla.*, 358 F.3d 859, 860 (11th Cir. 2004) (same).  Moreover, while "[a]ll reasonable inferences must be resolved in favor of the non-movant, . . . inferences based upon speculation are not reasonable."  *Marshall v.*

_____

[6]Evans did not actually testify that Defendant did not respond to the letter.  Rather, he testified that he did not know if Network Services responded.  Doc. 42-2 at 20 (Dep. p. 73).  However, the court views the evidence in the light most favorable to Plaintiff and assumes that Defendant did not respond.

*City of Cape Coral, Fla.*, 797 F.2d 1555, 1559 (11th Cir. 1986) (citation omitted);

*see also Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005)

("Speculation does not create a *genuine* issue of fact . . . ." (quotation omitted)

(emphasis in original)).  A "non-moving party cannot create a genuine issue of

material fact through speculation, conjecture, or evidence that is merely colorable

or not significantly probative." *Bryant v. Dougherty County Sch. Sys.*, 2010 WL

2399351, at * 2 (11th Cir. June 15, 2010) (per curiam) (citations and internal

quotation marks omitted).

Here, Plaintiff states that a reasonable jury could find for him based on a

letter stating that Plaintiff's denial was for "past history" and Defendant's failure

to provide an explanation for the Credentialing Committee's decisions in form

letters or in response to inquiries from Plaintiff's counsel.  Plaintiff states: "Blue

Cross's silence on the letters from Croyle speaks volumes.  If Blue Cross had a

legitimate basis for its denial of Dr. Austin's application, it would have so stated.

Instead Blue Cross continued its stonewall."  Doc. 41 at 21-22.  However, Plaintiff

provides no *evidentiary* support for his assertion that Defendant's silence should

be treated as an acknowledgment of discriminatory treatment.  In fact, Evans

testified that the Credentialing Committee's standard practice is to not provide a

reason for denials.  Doc. 42-2 at 18 (Dep. p. 67).  Furthermore, the Eleventh

21

Circuit has rejected attempts to create pretext from such form letters.  *See Bryant*,

2010 WL 2399351, at * 2 (declining to find pretext in a form letter that provided

no explanation for the defendant's decision not to promote the plaintiff).  With

respect to the letter informing Plaintiff that the denials were based on "past

history," Evans testified that the phrase referred to Plaintiff's past history of

overutilization.  Doc. 42-2 at 20 (Dep. pp. 74-75).  Plaintiff seeks to ignore this

past history, which he does not contest (i.e. Plaintiff does not challenge

Defendant's decision to terminate him back in 1998), but rather he urges the court

to find that the phrase refers instead to his "past history" of drug abuse or, at a

minimum, creates an ambiguity.  Essentially, Plaintiff wants this court to overlook

the clear evidence of his past history of overutilization and over-billing and to find

instead that Defendant meant his past history of drug use.  While the court is

obligated to resolve inferences in the non-movant's favor, inferences must,

however, be reasonable and not, as Plaintiff seeks, based on speculation and

conjecture.  At most, the phrase "past history" in the 2005 letter is a "mere

scintilla" of evidence; no reasonable jury could determine on the basis of that

letter that Defendant's denials were based on his history of substance abuse and

*not* on his past history of overutilization.

### 3.      *Defendant Readmitted Another Doctor*

Plaintiff's final argument is that Defendant readmitted another physician terminated for overutilization and, accordingly, applied a different standard to Plaintiff based on his disability.  Doc. 41 at 22.  Evans testified that, of the twenty-eight doctors terminated since 2001 for overutilization, Defendant has readmitted only one.[7]  Doc. 42-2 at 10 (Dep. pp. 33-34).  Evans explained that the readmitted physician worked in a practice with serious overutilization issues and that the readmitted physician actually sued the owner of the practice.[8]  *Id*.  Evans further explained the difference in treatment: "[Plaintiff] as a person was aware of his situation.  The other provider in the view of Blue Cross was not aware in any shape, form or fashion that he was being over-utilized.  As a matter of fact, he sued the provider and won his case."  *Id.* at 18 (Dep. p. 66).  This reason sufficiently distinguishes this alleged comparator from Plaintiff.  As the case law

---

[7]Defendant submitted an affidavit from Evans with its motion for summary judgment that stated that four other physicians have been terminated from the PMD Program and none readmitted.  Doc. 35-11 at 6 ¶ 17.  After Defendant filed its motion, the court granted Plaintiff's request to depose Defendant's representative.  Doc. 40.  After reviewing records regarding terminations from 2001 to 2009, Evans determined that Defendant had terminated twenty-eight physicians for overutilization and readmitted only one.  Doc. 42-2 at 10 (Dep. pp. 33-34).

[8]According to Plaintiff, the readmitted physician previously worked at Rapid Care.  Doc. 41 at 22.  If Plaintiff is correct, this further proves that the comparator is not similarly situated to Plaintiff.  After all, the MLCA suspended Plaintiff's medical license as a result of his conduct, which included overutilization and over-billing.  There is no evidence here that the readmitted physician engaged in the same level of conduct.

states unequivocally, "[a] comparator is an employee similarly situated to the plaintiff in all relevant respects." *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1280 (11th Cir. 2008) (citations and internal quotation marks omitted); *see also Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999) ("We require that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges.").  In short, the readmitted physician is not a proper comparator for Plaintiff, and this evidence is insufficient to establish a material issue of disputed fact.

Because Plaintiff fails to establish that Defendant discriminated against him on the basis of or solely by reason of his disability, Plaintiff's ADA and Rehabilitation Act claims fail.

**D.    *The PMD Program as a Place of Public Accommodation***

Even if Plaintiff had presented sufficient evidence to establish a material issue of fact on causation, the court is troubled by Plaintiff's assertion that Defendant's PMD Program is a "place of public accommodation."  The phrase "public accommodation" is defined in terms of twelve categories of facilities leased or operated by private entities "if the operations of such entities affect commerce."  42 U.S.C. § 12181(7).  The category invoked here is: "a laundromat

dry-cleaner, bank, barber shop, beauty shop, travel service, shoe repair service, funeral parlor, gas station, office of an accountant or lawyer, pharmacy, *insurance office*, professional office of a health care provider, hospital, or other service establishment." 42 U.S.C. § 12181(7)(F) (emphasis added). Defendant argues that the (1) PMD Program is itself not a physical space or facility, (2) it is administered through Defendant's corporate headquarters, which is not open to the general public, and (3) the PMD Program is not a service available to the general public but, rather, is limited to licensed physicians who apply. Doc. 34 at 24-29. Plaintiff counters that (1) licensed physicians are members of the general public, and (2) Defendant's corporate headquarters cannot be carved out from the ADA's broad application to insurance offices. Doc. 41 at 26-29.

The case presents what another district court has called a problem of "fit." *Shepherd*, 464 F. Supp. 2d at 1082. In *Shepherd*, Paralympic wheelchair athletes brought a disability discrimination claim against the United States Olympic Committee, claiming that the Committee provided them programming, privileges, and financial support inferior to that provided to non-disabled athletes. Considering whether Title III of the ADA applied, the court stated:

> My initial concern is with the assertion that U.S. Olympic Training
> Centers are "places of public accommodation" within the
> contemplation of 42 U.S.C. § 12181(7) and that financial support,

25

> insurance, being able to walk in opening ceremonies, receiving prize
> money, or serving on governing bodies are "goods, services,
> facilities, privileges, [or] advantages" attendant the operation of those
> "places" for purposes of the ADA.  Olympic Training Centers are
> venues to which only the most select athletes in the nation have
> access.  They are not recreation centers, stadia or arenas held out for
> use by the non-disabled public at large.

*Id.* at 1082, 1086 (further concluding "that the ADA and Rehabilitation Act are

aimed at the baser stuff of discrimination, such as the denial generally of a

disabled person's right to participate fully and equally in public life, including

places offering sports and recreation to the general public").  Similarly, Plaintiff

here does not seek access to the services Defendant offers to the general public,

such as health care insurance.  Rather, Plaintiff seeks access to Defendant's

preferred provider list, which is limited to licensed physicians approved by

Defendant's Credentialing Committee.

The cases Plaintiff cites do not necessarily compel the conclusion that Title

III applies to Defendant's PMD Program.  In *Pallozzi v. Allstate Life Insurance

Co.*, 198 F.3d 28 (2d Cir. 1999), the Second Circuit rejected an insurance

company's argument that the ADA did not reach its insurance underwriting

practices.  In that case, the plaintiffs argued that the defendant improperly denied

them an insurance policy on the basis of their disability.  The Second Circuit noted

that Title III specifies an "insurance office" as a "public accommodation" and that

26

insurance policies are the most common "goods" and "services" provided by an "insurance office."  *Id.* at 31 (citing 42 U.S.C. §§ 12181(7)(F), 12182(a)).  The court then reached the eminently reasonable conclusion that "an entity covered by Title III is not only obligated by the statute to provide disabled persons with physical access, but is also prohibited from refusing to sell them its merchandise by reason of discrimination against their disability."  *Id.* at 33.  Such is not the case here.  Like any other physician, Plaintiff is free to apply to the PMD Program and, in fact, was selected for participation previously.  However, he abused the privilege previously by over-billing and overutilization, and Defendant has chosen not to reinstate him for these reasons.

The second case Plaintiff relies on addressed whether the disabled plaintiffs could maintain an ADA claim against health-maintenance organizations that allegedly controlled providers and caused them to delay or deny professional treatment and services to force higher-cost disabled patients to go elsewhere. *Zamora-Quezada v. HealthTexas Med. Group of San Antonio*, 34 F. Supp. 2d 433 (W.D. Tex. 1998).  In that case, unlike here, the plaintiffs alleged discrimination in the provision of goods and services – medical treatment – most commonly provided by medical professionals to the general public.

Neither case relied on by Plaintiff clearly establishes that the ADA applies

27

to an insurance company's preferred provider list.  Ultimately, however, the court finds that Plaintiff's failure to establish discrimination on the basis of disability obviates the need to definitively decide this difficult question.

### E.   *Defendant as a Recipient of Federal Financial Assistance*

Defendant further argues that Plaintiff's Rehabilitation Act claim fails because it is not a recipient of federal financial assistance within the meaning of Section 504.  Doc. 34 at 29-32.  Plaintiff urges the court to find that Defendant falls within the Act because it receives federal funding for administering Medicare.  Doc. 41 at 30-33.

The court agrees with Defendant that Plaintiff improperly conflates federal funding with federal financial assistance.  Although the Rehabilitation Act does not define "federal financial assistance," the Department of Health and Human Services defines federal financial assistance to mean "any grant, loan, contract (other than a procurement contract or a contract of insurance or guaranty) . . . ." 45 C.F.R. § 84.3(h).  Defendant presents evidence that it administers Medicare Part A through a procurement contract.  Doc. 35-10 ¶ 3.  However, the Southern District of New York has previously refused to grant summary judgment in favor of Blue Cross and Blue Shield on this point, finding that the company "acts a conduit for Medicare funds, performing various functions and ultimately

distributing the funds" and therefore may fall within the Rehabilitation Act.

*Bernard B. v. Blue Cross & Blue Shield of Greater N.Y.*, 528 F. Supp. 125, 132

(S.D.N.Y. 1981), *judgment aff'd without opinion* 679 F.2d 7 (2d Cir. 1982).

Because Plaintiff fails to establish that Defendant discriminated against him solely

by reason of his disability, the court does not decide this issue.

## IV.    MOTION TO STRIKE

Defendant also moves to strike Plaintiff's demand for damages.  Doc. 32.

Plaintiff concedes that Defendant's motion to strike is due to be granted and that

he is not entitled to compensatory damages under the ADA.  Doc. 41 n.1.  He

further stipulates that punitive damages are not applicable to his ADA or

Rehabilitation Act claims.  *Id*.  Defendant replies, arguing that Plaintiff is also not

entitled to attorney's fees.  Doc. 47.  "Monetary damages are not available in

private suits under Title III of the ADA . . .  but the ADA gives courts the

discretion to award attorney's fees to prevailing parties."  *Molski*, 481 F.3d at 730

(internal citation omitted); *see also Ass'n of Disabled Americans v. Neptune*

*Designs, Inc.*, 469 F.3d 1357, 1359 (11th Cir. 2006) (prevailing party in Title III

suit entitled to attorney's fees pursuant to 42 U.S.C. § 12205).  Thus, to the extent

that Defendant argues that a prevailing Title III plaintiff can never recover

attorney's fees, that argument is clearly erroneous.  However, because Plaintiff's

claim fails, he cannot recover fees here.

**V.      CONCLUSION**

For the reasons stated above, Defendant's Motion for Summary Judgment and Motion to Strike are GRANTED, and this case is hereby DISMISSED with prejudice.

DONE this 30th day of September, 2010.


_____
**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE